ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  SmythB@sec.gov
REBECCA LUBENS (Cal. Bar No. 240683)
  LubensR@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| THE ESTATE OF KENNETH J. CASEY, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1. From at least June 2011 until his death in May 2020, Kenneth J. Casey, the founder of Professional Financial Investors, Inc. ("PFI"), a real estate investment and management company in Marin County, California, misappropriated $10,317,933 from investors as part of a larger fraudulent scheme in which hundreds of millions of dollars were raised from more than 1,300 investors in PFI, Professional Investors Security Fund, Inc. ("PISF" and,

together with PFI, "the Companies") and other related entities. Many of the defrauded investors were elderly, retired and relying on their investment income for daily living expenses.

2. Casey made false and misleading statements to solicit investors and sell securities issued by the Companies. Casey falsely told investors that their money would be primarily used to invest in multi-unit residential and commercial real estate to be managed by PFI. Instead, a significant portion of investor funds was used in a Ponzi-like fashion to pay existing investors.

3. In furtherance of the fraud, Casey also directed PFI employees to falsify financial statements provided to investors to create the impression that investments in the Companies and related entities were safe and profitable. For example, Casey instructed PFI employees to inflate cash reserves and decrease expenses reflected in financial statements provided to investors. Casey did not provide any accounting justification for the changes to the financial statements he directed and, indeed, explicitly acknowledged to certain PFI employees that the changes to the financial statements were intended to improve the appearance of the Companies' financial condition for investors.

4. In addition, Casey used investor money to personally enrich himself. Casey used the $10,317,933 he misappropriated to, among other things, fund a large renovation of one of his personal residences and to pay his personal federal and state tax obligations.

5. The fraudulent scheme began to unravel shortly after Casey's death on May 6, 2020, when a review of PFI's and PISF's financial records revealed questions about the short-term solvency of the entities as well as the historical operations of both Companies. On September 29, 2020, the Commission filed an action against Lewis I. Wallach, the former president of PFI, for his role in the fraudulent scheme and his misappropriation of funds from investors. *SEC v. Wallach*, Case No. 3:20-cv-06756-MMC (N.D. Cal. Sept. 29, 2020).

6. Defendant Casey violated the antifraud provisions of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77(q)(a)]. The Commission seeks by way of this complaint disgorgement

from The Estate of Kenneth J. Casey of the $10,317,933 Casey misappropriated from investors, together with prejudgment interest in an amount of $1,616,929 thereon.

**JURISDICTION AND VENUE**

7. The Commission brings this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

9. Casey, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Casey met with and solicited prospective investors in this District, and offers and sales of securities took place in this District.

11. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in Marin County.

**DEFENDANT**

12. **The Estate of Kenneth J. Casey** is the successor in interest to Kenneth J. Casey, who died on May 6, 2020. Casey founded PFI in 1990 and served as its sole officer, director and shareholder until 1998, when he relinquished his corporate positions. Nevertheless, Casey continued to exercise significant control over PFI until his death. Casey founded PISF in 1983 and served as its sole shareholder, officer and director until his death.

# RELATED ENTITIES

13. **Professional Financial Investors, Inc.** is a California corporation based in Novato, California that was founded in 1990. PFI is a real estate investment and management firm specializing in multi-unit residential and commercial real estate in Northern California. On July 26, 2020, PFI filed a voluntary Chapter 11 bankruptcy petition in the Bankruptcy Court for the Northern District of California.

14. **Professional Investors Security Fund, Inc.** is a California corporation based in Novato, California that was founded in 1983. PISF is a real estate investment and management firm that serves as limited partner for 10 real properties in Northern California. PFI is the general partner for each of the 10 real properties for which PISF serves as limited partner. On July 16, 2020, a group of PISF investors filed an involuntary Chapter 11 bankruptcy petition against PISF in Bankruptcy Court for the Northern District of California.

# FACTUAL ALLEGATIONS

**A.  Background of PFI and PISF and the Securities Offered and Sold**

15. Casey founded PISF in 1983 and PFI in 1990. Both companies were founded as real estate investment and management firms specializing in multi-unit residential and commercial properties in Northern California.

16. Casey served as the sole director, officer and shareholder of PFI until 1998, when he relinquished his corporate positions. Despite relinquishing his corporate positions, Casey continued to exert significant control over PFI until his death. Casey served as the sole shareholder, officer and director of PISF from the time he founded the company until his death.

17. Together PFI and PISF own a direct or indirect interest in approximately 70 residential and commercial real properties in California, including equity interests in limited liability companies (together, the "LLCs") that hold either fee title or an interest as tenant-in-common in various real properties and general partner interests in limited partnerships (together, the "LPs") that hold fee title to various real properties.

18. PISF is the majority limited partner of the 10 LPs, with the remaining interests in the LPs held by individual investors. PFI serves as the property manager for all of the properties in which it and PISF hold a direct or indirect interest. PFI is also the operational arm that manages the activities of itself and PISF.

19. Since at least June 2011 through May 2020, at Casey's direction, PFI and PISF raised funds from investors through the offer and sale of securities.

20. PFI and PISF offered and sold at least three different types of securities to investors:

    a) Promissory notes issued by PISF and purportedly secured by PISF's interests in the LPs (together, the "Straight Notes"). PISF Straight Notes carried an annual interest rate of 9% to 12%. Investors could choose either a monthly cash payment or allow the interest to accrue.

    b) Promissory notes issued by PISF or PFI and purportedly secured by fractionalized interests in junior deeds of trust on real properties owned by the LPs or PFI (together, the "DOT Notes"). The DOT Notes carried an annual interest rate of 6% to 9%. Investors received a monthly cash payment.

    c) Equity membership interests in various LLCs (together, the "LLC Members") that purchased real properties. PFI served as the general manager of the LLCs and held a 30% to 40% ownership stake in the LLCs. LLC Members received quarterly distributions that on average provided for an annual return of 6% to 9%.

21. Casey told investors that the interest payments and equity distributions for all of the securities offered and sold by PFI and PISF were to be made based on the income generated by PFI's management of the underlying real property, including collection of rents from tenants.

B.  **The Fraudulent Scheme**

22. From at least June 2011 through May 2020, PFI and PISF raised hundreds of millions of dollars from more than 1,300 investors through the offer and sale of the securities described above. A significant portion of those investors are elderly and invested IRA or other retirement funds. Many investors relied on investment returns to pay their daily living expenses.

23. Casey was actively involved in the offer and sale of securities by PFI and PISF. Casey served as the primary initial interface with new investors from June 2011 through May 2020. Casey provided investors with investment documentation and made verbal representations regarding the securities to both new and existing investors.

24. While soliciting investments for PFI and PISF, Casey made numerous false and misleading statements to investors.

1.  **Casey Made Misrepresentations to Investors Regarding the Use of Investor Funds**

25. Casey falsely told investors in each of the categories of securities offered by PFI and PISF that their monies would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF.

26. Investors in the Straight Notes and the DOT Notes did not typically receive a prospectus or other document describing the nature of the investment. Instead, Casey made verbal representations to these investors that monies raised would be primarily used to purchase real property and make improvements to real property already owned by PFI or PISF.

27. Unlike investors in the Straight Notes and DOT Notes, LLC Members were provided an investment memorandum that provided certain disclosures regarding the investment (the "Investment Memorandum"). The Investment Memorandum, which Casey played a significant role in drafting, stated that investor funds would be used to purchase, manage and sell a specific real property within a seven-year period and that cash proceeds from the sale would then be distributed to members.

COMPLAINT
SEC V. THE ESTATE OF KENNETH J. CASEY                -6-

28.     Casey personally provided or directed others at PFI to provide the Investment Memorandum to a number of LLC Members.  Casey also made verbal representations to LLC Members that their investment funds would be used to purchase and manage real property.

29.     The representations Casey made to investors in the Straight Notes, DOT Notes and the LLC Members regarding the use of investor funds were false and misleading.

30.     Contrary to Casey's representations that investor funds would be used primarily to purchase and improve real property, Casey knew that, in reality, a substantial portion of investor funds were used in a Ponzi-like fashion to pay back previous investors or to cover operating losses at PFI and PISF.

**2.     PFI and PISF Used Investor Funds in Ponzi-Like Scheme**

31.     By at least September 2015, the real properties owned by PFI, PISF and the related entities did not generate sufficient cash flows through rents and realized property appreciation to service the first mortgage bank loans on them and the securities issued to investors by the entities.

32.     For example, between September 2015 and May 2020 – a period in which PFI and PISF raised approximately $330 million from investors – over $150 million was used in a Ponzi-like fashion to pay interest to prior investors, pay certain investors principal and cover the operating losses of PFI and PISF.

33.     When investor funds were raised by PFI and PISF, they were generally deposited into accounts associated with the entity for which the funds were purportedly raised.  However, Casey authorized investor funds to be effectively commingled and used to meet PISF's and PFI's obligations (including interest payments to prior investors) without regard for the entity for which the funds were purportedly raised.

34.     At the time that Casey authorized the commingling of investor funds and the use of new investor funds to make interest and principal payments to previous investors, Casey knew that such uses of the funds were contrary to Casey's representations to investors that their funds would be used primarily for the purchase and improvement of real property.  Indeed, at various

points, PFI's then controller and Chief Financial Officer expressed concerns about the amount of debt encumbering the properties, in light of the Companies' mounting costs, and questioned Casey's direction to use money from one property to pay out investors in a different property. Casey dismissed the concerns and ordered the practices to continue.

### 3. Casey Misappropriated More Than $10 Million in Investor Funds

35. In addition to his role in operating the Ponzi-like scheme, between June 2011 and May 2020, Casey misappropriated more than $10 million in investor funds.

36. Casey treated the Companies' bank accounts as his personal funds, accessing them regularly to use investor monies for his own personal enrichment. Casey's misappropriation of investor funds fell into five general categories.

37. First, Casey misappropriated more than $1.3 million in cash from investors. Many investors directly provided Casey with cash to fund their investments. Rather than provide those funds to the entity for which the investment was intended, Casey took the cash for himself and stored it, along with other funds, in a safe at his personal residence.

38. Second, Casey misappropriated more than $1.4 million from investors to pay for labor performed at Casey's personal residence for Casey's personal benefit. Casey directed PFI employees to be paid from company accounts funded by investor funds for work the employees performed not on behalf of the Companies, but for Casey's personal benefit.

39. Third, Casey misappropriated more than $2.6 million from investors to pay his personal federal and state tax obligations. Casey directed the payment of his personal tax obligations from company accounts funded by investor funds.

40. Fourth, Casey misappropriated more than $2.5 million from investors to fund a large renovation of one of his personal residences. Casey instructed PFI employees to transfer monies to a standalone checking account established for the purposes of paying for the renovation of Casey's personal residence with transfers from company accounts funded by investor funds.

41. Fifth, Casey misappropriated more than $2.3 million from investors for other personal purposes, including the transfer of funds to Casey directly, the use of investor funds to make rent payments for his ex-wife's family members, and the use of investor funds to make payments on Casey's personal credit card.

42. In summary, the major categories of Casey's misappropriation were as follows:

| | |
|---|---|
| Cash from investors: | $1,304,616 |
| Labor for Casey's personal benefit: | $1,406,308 |
| Personal tax obligations to IRS/state: | $2,685,368 |
| Renovations: | $2,545,527 |
| Other misc: | $2,376,114 |
| **Total:** | **$10,317,933** |

43. At the time Casey misappropriated investor funds, he knew, or was reckless in not knowing, that he was not entitled to the funds and that his misappropriation of the funds was contrary to the representations he made to investors regarding the use of their funds.

### 4. Casey Made Misrepresentations to Investors Regarding the Safety and Liquidity of the Securities

44. Between June 2011 and May 2020, Casey misrepresented to investors the safety and liquidity of the securities offered and sold by PFI and PISF.

45. Casey falsely told investors that their investments were liquid and could be cashed out at any time, with as little as a few days' notice. He falsely represented to investors that PFI and PISF maintained substantial reserve funds for that purpose.

46. Contrary to his representations, Casey knew, or was reckless in not knowing, that PFI and PISF lacked adequate cash to meet their obligations without bringing in new investor funds, let alone cash sufficient to provide liquidity to investors seeking to withdraw their investments on short notice.

47. Casey also approved regular investor requests to liquidate investments with little notice and without regard for any holding period provided for in the Investment Memorandum.

Casey told PFI's former President that the approval of these payouts was an important way of messaging to investors that their investments were liquid and that the Companies' financial condition was strong.

### 5. Casey Directed the Falsification of Financial Statements Provided to Investors

48. From at least 2017, in order to create the impression that investments in PFI and PISF were safe and profitable, Casey directed PFI accounting personnel to falsify quarterly financial statements sent to LLC Members by inflating the cash reserve balances and moving expense items to the balance sheet to exaggerate the entity's financial performance.

49. Casey regularly reviewed financial statements generated from the Companies' general ledger. He would then provide PFI's then controller and Chief Financial Officer with, generally handwritten, revisions on a hard copy of the financial statements. Casey instructed PFI's then controller and Chief Financial Officer to make the revisions prior to providing the financial statements to investors.

50. The revisions that Casey directed be made to the financial statements generally had the impact of increasing cash reserves or decreasing expenses. Casey did not provide an accounting basis for the revisions. Indeed, Casey explicitly acknowledged to both PFI's former President and PFI's former controller and Chief Financial Officer that the revisions were intended to improve the appearance of the Companies' financial condition for investors.

51. As one example, Casey directed revisions to a particular LLC's financial statement for the first quarter of 2018. The Companies' financial records reflected a cash balance for the LLC of $850. Casey, however, instructed PFI personnel to revise the financial statement to reflect a cash balance of $380,000. The revised financial statement was then provided to investors at Casey's direction. Casey made similar revisions to numerous financial statements provided to investors since at least 2017.

52. Casey directed revisions to the financial statements despite knowing that the changes did not reflect the true financial condition of the entity for which the financial statement pertained.

# CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder, and Section 17(a) of the Securities Act*

53. The Commission re-alleges and incorporates by reference Paragraph Nos. 1 through 52.

54. By engaging in the conduct described above, Casey, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    (a) Employed devices, schemes, or artifices to defraud;

    (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

55. By engaging in the conduct described above, Casey, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

    (1) with scienter, employed devices, schemes, or artifices to defraud;

    (2) obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (3) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

56. By reason of the foregoing, Casey violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)], and The Estate of Kenneth J. Casey is therefore liable, as Casey's successor in interest, for disgorgement of the profits he obtained as a result in the amount of $10,317,933, as well as prejudgment interest in the amount of $1,616,929 thereon. The prejudgment interest rate used to calculate the $1,616,929 amount is the federal short term rate plus three percentage points, a fair and reasonable rate and the same rate used by the Internal Revenue Service to calculate underpayment penalties. 26 U.S.C. § 6621(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue an order requiring The Estate of Kenneth J. Casey to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this complaint in the amount of $10,317,933, together with prejudgment interest in the amount of $1,616,929 thereon.

### II.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### III.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: June 2, 2021            Respectfully submitted,

                                          /s/ Bernard B. Smyth
                                        BERNARD B. SMYTH
                                        Attorney for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION